## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ZIAD SAKR FAKHRI**, | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil No. **PJM 14-840** |
| | * | |
| **MARRIOT INTERNATIONAL** | * | |
| **HOTELS, INC.**, | * | |
| | * | |
| Defendant | * | |
| | * | |

## <u>MEMORANDUM OPINION</u>

Ziad Sakr Fakhri ("Fakhri") has brought suit against Marriott International Hotels, Inc. ("Marriott"), a Maryland corporation, for tortious interference with contractual relations in violation of Article 122 of the Lebanese Code of Obligations and Contracts. The suit arises out of an extended litigious relationship between parties relating to the operation of a hotel in Beirut, Lebanon. The hotel was owned by a company known as Jnah Development, S.A.L. ("Jnah"), and, until July 2007, was operated by Marriott under a Management Agreement with Jnah. By the time Marriott terminated the Management Agreement in 2007, Jnah had brought two separate arbitration proceedings against it at the International Chamber of Commerce ("ICC") in Paris, both related to Marriott's management of the hotel.

In 2009, Fakhri, a shareholder of Jnah, together with other shareholders, entered into a contract to sell their shares, which purportedly granted Fakhri the right to arbitrate certain claims against Marriott on Jnah's behalf. On that basis, Fakhri initiated a third arbitration proceeding against Marriott at the ICC related to Marriott's termination of the Management Agreement ("Jnah 3" arbitration). Fakhri alleges, however, that before the arbitration took place, Marriott

entered into a secret, illicit settlement agreement with Jnah's new owners, Shayah-owned Jnah,[1] inducing them both to disaffirm Fakhri's right to arbitrate the claims and to testify against him in the Jnah 3 arbitration proceedings.

Prior to the initiation of the present suit for tortious interference, the ICC tribunal in Jnah 3 issued a final arbitral award, holding that Fakhri lacked authority to bring the arbitration claims on behalf of Jnah.  Fakhri, ostensibly on Jnah's behalf, appealed this decision to the French courts, arguing, among other things, that the award had been obtained through fraud and collusion arising out of the secret agreement between Marriott and Shayah-owned Jnah.  As things now stand, Fakhri's complaints of fraud have been entirely rejected by the French courts—although it is possible that he may yet attempt one final appeal.

Before this Court, Marriott has moved to dismiss Fakhri's claims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that: (1) the ICC alone has jurisdiction to resolve claims related to the Jnah-Marriott Management Agreement, and (2) under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), this Court lacks jurisdiction to vacate, modify, or set aside the ICC's award, which Fakhri effectively seeks to do in this suit by collaterally attacking the award.

For its part, Marriott has brought counterclaims against Fakhri for fraud, negligent misrepresentation, and unjust enrichment, alleging that he falsely represented that he had the

---

[1] Shayah-owned Jnah refers to Jnah after Fakhri sold his interest in Jnah, whose new owners formed Shayah Holdings S.A.L. to purchase Jnah.  Prior to the sale, when owned by Fakhri and others, Jnah was formally known as Jnah Development, S.A.L., or simply Jnah. The term Shayah-owned Jnah has been employed primarily by Fakhri himself in this proceeding.  *See* Amended Complaint, ECF No. 76. However, neither the ICC tribunal nor the French courts have used the term, instead referring to "Jnah" or the "Jnah company" both before and after the sale.  This Court will, for the most part, follow this usage by the arbitral panel and the French courts, with the understanding that, unless the context requires otherwise, Jnah means Shayah-owned Jnah.

right accept payment for an earlier arbitral award on Jnah's behalf ("Jnah 2" award), whereas that payment should rightfully have been made to Jnah's new owners. Fakhri has moved to dismiss the counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Marriott's counterclaims are time-barred by the statute of limitations and that, in any event, Marriott has failed to state a claim.

For reasons that follow, the Court will **GRANT** Marriott's Motion to Dismiss for Lack of Subject Matter Jurisdiction, finding that this suit constitutes a collateral attack on the Jnah 3 award. Further, the Court will **DISMISS** Marriott's counterclaims, since Marriott concedes that jurisdiction over its counterclaims depends on the Court's jurisdiction over Fakhri's claims.

## I.

### Factual and Procedural Background

Fakhri initiated this suit during the pendency of his appeal of ICC tribunal's ruling that he did not have the right to bring claims on behalf of his former company, Jnah, in what was the third arbitration between Jnah and Marriott over the hotel management contract ("Jnah 3").

### A.

From 1994 to May 2009, Fakhri was an officer and shareholder of Jnah Development S.A.L., a Lebanese company that owned a hotel in Beirut. Am. Compl. ¶ 5, ECF No. 76. Fakhri and other members of his family, including his father, Sakr Fakhri, owned slightly over 86% of the share capital in Jnah. *See* Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 45, ECF No. 104-3. In 1994, Jnah and Marriott entered into a series of agreements (the "1994 Marriott-Jnah Agreements") under which Marriott was to manage and operate the hotel owned by Jnah (the Beirut Marriott). Am. Compl. ¶ 15. The Management Agreement, one of the key 1994 Marriott-Jnah Agreements in this case, contained an arbitration clause pursuant to which any dispute

arising out of the Management Agreement was to be resolved through arbitration before the ICC.[2]  The First Jnah arbitration, while not particularly relevant to the precise issue before the Court, is worth recounting as background to the relationship between Jnah and Marriott.  That arbitration, Jnah 1, arose over Marriott's management of the hotel.  Although Marriott initiated Jnah 1, the ICC tribunal, on October 30, 2003, awarded Jnah $850,000 and gave Fakhri access to the hotel's books of control and account.  *Id.* ¶¶ 26-30.

On June 20, 2005, Jnah, through Fakhri, initiated a second arbitration ("Jnah 2"), claiming, on the basis of the hotel books, that Marriott had made improper deductions, had failed to maintain the hotel as a 5-star property, and had employed a clerk who stole some $500,000 from the hotel.  *Id.* ¶¶ 37-38.   Marriott counterclaimed, alleging that Jnah had failed to provide the hotel with sufficient working capital and had misappropriated Marriott trademarks.  *Id.* ¶ 39.

Then, on July 18, 2007, while Jnah 2 was still pending, and in the wake of another dispute between parties, Marriott ceased management of the hotel.  *See id.* ¶¶ 40-43.  Fakhri alleges that, in the depressed hotel market following the 2006 Israeli-Hezbollah war, Marriott had demanded that Jnah provide $92,000 in capital within ten days.  *Id.*  When the parties could not come to an agreement as to the capital, Marriott ended its management of the hotel and terminated the Management Agreement.  *Id.*

Fakhri's Amended Complaint before this Court states that Marriott's sudden withdrawal

---

[2] The arbitration clause of the Management Agreement states in the relevant part:

> Except as otherwise specified in this Agreement, any dispute, controversy, or claim arising out of or relating to this Agreement, or the breach, termination, or invalidity thereof, shall be settled by arbitration in accordance with the rules of procedures of the International Chamber of Commerce (or any similar successor rules thereto) as are in force on the date when a notice of arbitration is received . . . . The decision of the arbitration board shall be final and binding upon the parties, and such decision shall be enforceable through any courts having jurisdiction.

Def.'s Mot. Dismiss, Ex. 6, Management Agreement ¶ 22.06, ECF No. 104-7.

resulted in Jnah's inability to fulfill a condition of a loan agreement that Jnah had with Arab Bank—which held a security interest in the hotel—that Jnah maintain a hotel operator.  This led Arab Bank to foreclose on the hotel, forcing a fire sale of the hotel to the detriment of Jnah's shareholders.  *See id.* ¶¶ 47-49.  Sabih El Masri—who, as it happens, is Fakhri's uncle and also the Vice Chairman of the Arab Bank, and who had made personal loans to Fakhri's father, Sakr Fakhri, the owner of the largest amount of Jnah stock—proposed to purchase Jnah from the shareholders, Plaintiff Ziad Sakr Fakhri included.  *Id.*

To acquire Jnah's shares, Masri formed an entity under Lebanese law called Shayah Holding S.A.L. ("Shayah").  *Id.* ¶ 51.  Pursuant to a signed February 5, 2009 settlement agreement with Masri entitled "Settlement Proposal," Ziad Sakr Fakhri—again, Plaintiff in the present suit—sold his shares to Masri in return for a cash payment of U.S. $7 million and an irrevocable power of attorney and an assignment of rights, ostensibly giving Fakhri the right to pursue certain claims Jnah held against Marriott.[3]  *See id.* ¶¶ 52-57; Am. Compl., Ex. 5, February 5, 2009 Settlement Proposal (English original), ECF No. 76-7.  The Settlement Agreement provided that Sakr Fakhri would transfer of his shares "in consideration for the settlement of Sakr's personal debt."  *See* Settlement Proposal at 1.  The Settlement Agreement further provided that "[i]n respect of the ICC arbitration case against Marriott," if the award was favorable, Fakhri would be "entitled to the full amount of any arbitration award after deduction of all related fees and expenses incurred since the initiation of the arbitration case," but if, on the other hand, the award was unfavorable, Fakhri would be "held liable for the full amount owed by the Company[.]" *Id.* at 2.  The Agreement also stated in the same paragraph that Jnah would

---

[3] Although the document is entitled "Settlement Proposal," it provided the terms of the Settlement Agreement, which was later executed in a Transfer of Shares Contract.  After considering how the agreement was titled, the Jnah 3 award thereafter refers to it as the "Settlement Agreement."  *See* Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶¶ 48-49, ECF No. 104-3.  The Court will refer to it similarly here.

"issue an irrevocable power of attorney to Ziad [Fakhri] authorizing him to (i) follow up on the arbitration proceedings . . . as well as to (ii) accept payment on behalf of the Company" if the arbitral award was favorable. *Id.*

On May 4, 2009, the Transfer of Shares Contract was executed, with four draft documents appended to it: (1) an Assignment of Rights ("AOR"), (2) an Irrevocable Power of Attorney ("POA"), (3) an Undertaking to draw up an Irrevocable Power of Attorney, and (4) a Declaration and Undertaking by Ziad Fakhri.  *See* Amend Compl. ¶ 54; Ex. 6, Transfer of Shares Document, ECF No. 76-8; *see also* Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 51, ECF No. 104-3.  Shayah-owned Jnah's Board of Directors approved the AOR and POA on July 10, 2009, and Fakhri received executed copies on October 27, 2009.  *Id.* ¶¶ 54, 58-59; Am. Compl., Ex. 7, Power of Attorney Document (Arabic original and English translation); Ex. 8, Assignment of Rights Document (Arabic original and English translation), ECF Nos. 76-9, 76-10.

The POA stated in relevant part that Jnah (the "Company"):[4]

> ha[s] mandated to Mr. Ziad Sakr Fakhri to plead on behalf of and defend the "Company" in all that is related to the existing dispute with the company Marriott International Inc. and the "Company" arising out of the relationship that existed with the "Company" before [May 4, 2009] including the arbitration case that is pending between it on one side and the company Marriott International Inc. before the International Chamber of Commerce and before the courts of all types . . . , this being a general power of attorney in relation to this arbitration case[.]

Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 66, ECF No. 104-3 (quoting English translation from Arabic); *see also* Am. Compl., Ex. 7, Power of Attorney (Arabic original and English

---

[4] In the Jnah 3 arbitration, the parties disputed whether the word "existing" should appear before the word "dispute" in the English translation. The ICC panel determined that "existing dispute" was the preferred translation.  Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 103 ("According to Judge Maamari, the original word in Arabic is "kaem" which he confirms should be translated as "pending" in English or "pendant" in French."). The Court quotes the English translation preferred by the ICC panel.

translation), ECF No. 76-9.[5]  The AOR stated in relevant part that Jnah (the "Company"):

> . . . assigns to the benefit of Mr. Ziad Sakr Fakhri all that is related to the existing dispute with the company Marriott International Inc. and the "Company" arising out of the relationship that existed with the "Company" before 5/4/2009 including the arbitration case brought by it against the company Marriott International Inc. Before the International Chamber of Commerce the proceedings of which are taking place in France – Paris and all the rights and amounts claimed in this case so that any amount or indemnity award to the "Company" would go to Mr. Ziad Fakhri whatever its value and the "Company" undertakes to settle such amount to Mr. Ziad Fakhri after deducting the amounts that the "Company" has incurred . . .from expenses and lawyers' fees[.]

Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 66, ECF No. 104-3 (quoting English translation from Arabic); *see* Am. Compl. ¶¶ 54-55; Ex. 8, Assignment of Rights (Arabic original and English translation), ECF No. 76-10.[6]

<u>Jnah 2 Award</u>

On June 4, 2009, before the Shayah-owned Jnah Board of Directors approved the POA and AOR to Fakhri, the ICC tribunal issued a Final Award in Jnah 2, which awarded Jnah U.S. $7,186,166.27 in damages against Marriott, plus interest and costs.  Am. Compl. ¶ 60; Am. Compl., Ex. 1, Jnah 2 Final Award, ECF No. 76-1.  According to the Amended Complaint in the present suit, Jnah 2 did not resolve claims arising out of Marriott's termination of the Management Agreement in July 2007.  In the award, the Jnah 2 tribunal stated that, ". . . Jnah is entitled to present claims and/or defenses in future proceedings relating to Marriott's closure of the Hotel and withdrawal from Lebanon."  Am. Compl. ¶ 64; Ex. 1, Jnah 2 Final Award ¶¶ 203-

---

[5] The Amended Complaint translates the POA as follows: the Irrevocable Power of Attorney enables Fakhri "to plead and defend on behalf of the Company in all what is related to the <u>dispute</u> with Marriott International Inc. and the Company arising from the relationship that used to exist with the Company prior to [May 4, 2009], including the arbitration pending between the Company on the one part and Marriott International Inc. before the International Chamber of Commerce. . . ."  Am. Compl. ¶ 56 (emphasis added).

[6] The Amended Complaint translates the AOR as follows: the Assignment gives to Fakhri the rights to "all what is related to the existing dispute confronting Marriott International Inc. and the Company as a result of the relationship that used to exist with the Company prior to [May 4, 2009], including the arbitration lodged by the latter against Marriott International Inc. before the International Chamber of Commerce." Am. Compl. ¶¶ 54-55.

05, ECF No. 76-1.  Marriott appealed the Jnah 2 award to the Cour d'Appel in Paris, which found in favor of Jnah in the amount of an additional €80,000.

On October 4, 2010, Marriott paid Fakhri U.S. $10,876,922.80 in satisfaction of the Jnah 2 award.  *See* Am. Compl. ¶ 73; Countercl. ¶ 11, ECF No. 83.  However, in Marriott's counterclaim in the case at bar, it alleges that Fakhri falsely represented that he had "entered into agreement with Jnah under which he was authorized to receive payment of the entire amount of the Jnah 2 award on behalf of Jnah."  Countercl. ¶¶ 7–8.

Fakhri, in his Amended Complaint, appears to have anticipated this allegation, stating that Marriott "advised from the outset of settlement communications in January 2010 that it had independently investigated Fakhri's authority."  Am. Compl. ¶ 70.  Further, says Fakhri, "[o]n information and belief, Marriott's internal accounting procedures required proper documentation of Fakhri's authority before Marriott could transfer $10.9 million to satisfy the Jnah 2 Award, which was entered in favor of a Lebanese company, Jnah, to the personal bank account of [a] former shareholder of the company."  *Id.* ¶ 69.

As indicated, although the ICC tribunal in Jnah 2 ruled in Jnah's favor and awarded it $7.18 million plus interest and costs, it did not rule on the effect of Marriott's decision to terminate the Management Agreement and cease operating the Hotel as of July 18, 2007.  Accordingly, on June 14, 2010, prior to Marriott's payment of the award in Jnah 2, Fakhri initiated the Jnah 3 arbitration before the ICC in Paris, seeking "damages caused by Marriott's wrongful, premature termination of the Management Agreement and other related contracts between the parties."  Def.'s Mot. Dismiss, Ex. 5, Jnah 3 Request for Arbitration ("RFA") at 1, ECF No. 104-7; *see* Am. Compl. ¶ 74.  The Request for Arbitration in Jnah 3 stated that Fakhri had authority to bring the arbitration pursuant to his POA.  *See* Jnah 3 RFA at 1.  According to

Fakhri's Amended Complaint in this Court, however, Fakhri states that Jnah 3 was brought by Jnah, "through Fakhri pursuant to his assignment and power of attorney[.]"[7] Am. Compl. ¶ 74.

Continuing on in his Amended Complaint, Fakhri alleges that, in February and March 2011, he and Marriott's Senior Vice President, Kevin Mantano, engaged in settlement discussions relative to the Jnah 3 claims.  Am. Compl. ¶¶ 78-79.  At one point during these settlement discussions, held in London over four days beginning on March 4, 2011, Mantano purportedly wrote on a napkin "10 now," which, according to Fakhri, meant an immediate cash payment to him of U.S. $10 million, and additional payments totaling U.S. $9 million to him thereafter, as well as an agreement to enter into a new hotel management arrangement.  *Id.*  No formal final settlement was drafted or otherwise reached at that time, however.

Settlement Agreement between Jnah and Marriott

Soon thereafter, on March 9, 2011, Mrs. Randa Abousleiman, counsel to Shayah-owned Jnah, wrote to Fakhri's counsel, asserting that the Settlement Agreement between Fakhri and Shayah-owned Jnah had not assigned all of Jnah's claims against Marriott to Fakhri, nor had it provided a general power of attorney to Fakhri to pursue such claims.  *See* Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 59, ECF No. 104-3.  Abousleiman thus demanded that Fakhri transfer the entire amount of the Jnah 2 award, about $10.9 million, to Shayah-owned Jnah's account.  Am. Compl. ¶¶ 80-83.  Fakhri says, however, that Abousleiman knew full well he was entitled to the entire amount, having recommended the assignment of rights to Shayah-owned Jnah's board, and that, in making a demand on Fakhri, Shayah-owned Jnah was only seeking to stake a claim to the funds after finding out their true worth.  *Id.*

---

[7] Fakhri has subsequently argued in the present suit that he brought Jnah 3 only pursuant to the POA.  *See* Pl.'s Resp. Opp'n at 18, ECF No. 111.  Both parties appear to have taken inconsistent positions on this issue as it became convenient and strategic to do so both in the French proceedings and in the present suit.

On March 18, 2011, Abousleiman contacted Marriott's counsel and inquired as to the payment of the Jnah 2 award. *See* Am. Compl. ¶ 85; Def./Cntr-Pl.'s Resp. Opp'n Mot. Dismiss at 10, ECF No. 145; Def.'s Reply Mot. Summ. J., Ex. 1, De Gramont Decl. ¶¶ 6-7, ECF No. 65-1 (averring that Abousleiman sent Marriott's French counsel an email on March 18, 2011, which stated "that Jnah had just learned that the Jnah 2 arbitration award had been confirmed . . . and inquired as to when could expect to receive payment."). When Marriott's counsel informed Abousleiman that it had already paid the Jnah 2 award to Fakhri personally, Abousleiman responded that Fakhri did not have the authority to collect funds on Jnah's behalf. Am. Compl. ¶ 85; *see* Def./Cntr-Pl.'s Resp. Opp'n Mot. Dismiss at 10, ECF No. 145. Abousleiman further told Marriott that Shayah-owned Jnah had not been aware that Fakhri had commenced the Jnah 3 proceeding and that he was not authorized to bring the Jnah 3 proceeding. *See* De Gramont Decl. ¶ 7, ECF No. 65-1; Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 60.

Instead of engaging in further settlement discussion with Fakhri as to the Jnah 3 claims, Marriott proposed its own settlement with Shayah-owned Jnah. Am. Compl. ¶¶ 86-87. Thus, on April 6, 2011, Marriott entered into a Settlement Agreement with Shayah-owned Jnah that purported to resolve all claims between Marriott and Jnah. Def.'s Mot. Dismiss at 5, ECF No. 104-1; Am. Compl., Ex. 2, Jnah-Marriott Agreement at 10-11, ECF No. 76-3.

Under the terms of the Settlement Agreement between Marriott and Shayah-owned Jnah, Marriott agreed to pay Shayah-owned Jnah $800,000 in return for "any and all assistance reasonably requested by Marriott to demonstrate to the Tribunal in Jnah III that Mr. Fakhri was not entitled, authorized or otherwise empowered to commence Jnah III . . . and that Jnah, through its legal and rightful representatives, seeks to dismiss Jnah III . . . ." Am. Compl., Ex. 2, Jnah-Marriott Agreement at 5, ECF No. 76-3; *see* Am. Compl. ¶¶ 91-92. This assistance would

specifically include "a letter from Mr. George Aouad, the Chairman/General Manager of Jnah, confirming that Mr. Fakhri was not authorized, entitled, or otherwise empowered to commence Jnah III" as well as witness testimony from Jnah's legal counsel and director, Abousleiman, "with respect to the scope and effect of the Power of Attorney and Assignment of arbitration Rights." Am. Compl. ¶ 90; Jnah-Marriott Agreement at 5-6. Marriott agreed to pay Shayah-owned Jnah up to an additional U.S. $2.4 million if the Jnah 3 arbitration was dismissed by the ICC panel. *See* Am. Compl. ¶ 91; Jnah-Marriott Agreement at 9. The terms of the Settlement Agreement released all of Jnah's claims against Marriott except "those Claims that were properly assigned to Mr. Fakhri to assert in *Jnah II*, which … [were] fully adjudicated and resolved by the Tribunal in *Jnah II*[.]" Jnah-Marriott Agreement at 10-11. To the extent that Shayah-owned Jnah had any claim against Marriott for wrongful payment of the Jnah 2 award to Fakhri, it is Marriott's position before this Court that the Agreement discharged Marriott from any liability for that claim, as well as from all claims related to the termination of the Hotel Management Agreements—presumably pursuant to the general release provision. *See id.*; Countercl. ¶ 12.

Fakhri alleges that, through all this, Marriott was trying to capitalize on "an opportunity to turn the family dispute" between Fakhri and his uncle, who controlled Shayah-owed Jnah, to its advantage and to obtain a release of Jnah's claims against it for a fraction of its settlement offer to Fakhri. *Id.* ¶¶ 86-88, 96. According to Fakhri, Marriott knew quite well at the time that Abousleiman's representations were false and that Fakhri in fact had POA and AOR to collect funds on Jnah's behalf and pursue the claims in Jnah 3. *Id.*

Marriott counters that Fakhri misrepresented his rights both under the POA and AOR, and that it settled with Shayah-owned Jnah only after learning that Fakhri did not, in fact, have the right to pursue those claims individually under his Settlement Agreement with Shayah-owned

Jnah. Def.'s Mot. Dismiss at 4, ECF No. 104; *see* Ex. 1, Jnah 3 Award ¶¶ 19, 60-63; *see also* Def.'s Reply Mot. Summ. J., Ex. 1, De Gramont Decl. ¶¶ 6-7, ECF No. 65-1.

<u>Jnah 3 Award</u>

On April 12, 2011, following the execution of its Settlement Agreement with Shayah-owned Jnah, Marriott requested that the Jnah 3 panel bifurcate the jurisdictional and merits portions of the arbitration on the grounds that it wished to prove that Fakhri lacked the authority to represent Jnah. *See* Amend Compl. ¶ 98. On April 13, 2011, George Aouad, Chairman of Shayah-owned Jnah, sent a letter to the Secretary General of the ICC that asserted Jnah did not commence the Jnah 3 proceedings and that Jnah did not "submit to the jurisdiction of the ICC in any respect." Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 19. On May 17, 2011, the arbitral panel agreed to bifurcate the case.

Prior to the September 2011 hearing set to decide the jurisdictional portion of the arbitration, Marriott's counsel and Shayah-owned Jnah's counsel agreed that they would be willing to produce the Jnah-Marriott Settlement Agreement in redacted form subject to a confidentiality agreement. *See* Jnah 3 Award ¶ 29. However, Fakhri and Marriott were unable to reach an agreement as to confidentiality or whether Fakhri had the right to disclose the Jnah-Marriott Settlement Agreement in other proceedings. *Id.* ¶¶ 29-33.

On September 26, 2011, the hearing as to the arbitral panel's jurisdiction was held. Am. Compl. ¶ 104. At the hearing, Marriott called Abousleiman, Shayah-owned Jnah's legal counsel and director, to testify that the Settlement Agreement did not give Fakhri the right to bring the Jnah 3 arbitration on Jnah's behalf. *Id.*; Jnah 3 Award ¶ 34. Aouad, Jnah's Chairman, provided a written witness statement on Marriott's behalf but was not called to testify. Jnah 3 Award ¶ 34. Both Marriott and Fakhri also called expert witnesses to provide evidence as to the proper

interpretation of both the POA and AOR, which were written in Arabic.  *See id.* ¶¶ 34, 118-19, 145-46.

In a Final Award issued on February 3, 2012, the ICC panel dismissed the Jnah 3 arbitration for lack of jurisdiction, concluding that Fakhri was not entitled to bring the proceeding.  Am. Compl. ¶ 105.  The panel considered evidence regarding the interpretation of the POA, including relevant language of the AOR, and reasoned that the phrase "existing dispute" in both the POA and AOR referred only to the claims in Jnah 2 rather than in Jnah 3.  Jnah 3 Award ¶¶ 64, 97, 145-46, 154, 159.   The panel also reasoned that the phrase in the POA, "in relation to this arbitration case," was limiting, since the only arbitration pending at the time the language was negotiated was Jnah 2.  *Id.* ¶¶ 115-20.

<u>French Annulment Proceedings – Appeal of Jnah 3 Award</u>

Fakhri appealed the ICC's Jnah 3 Final Award to the Cour d'Appel of Paris.  In an initial decision issued on January 24, 2013, the Magistrate in Charge of Pretrial ruled that Fakhri could pursue the appeal under his POA but not under the AOR, since Fakhri had not brought the arbitration proceeding in his personal capacity.  *See* Pl.'s Resp. Opp'n Mot. Stay, Ex. 1 to Teynier Decl., Cour d'Appel of Paris, Interlocutory Order Before Magistrate, Jan. 24, 2013, R.G. No. 12/07231, ECF No. 86-1.  On June 4, 2013, the Court d'Appel upheld the decision of the Magistrate that Fakhri could proceed only pursuant to the POA.  *See* Pl.'s Resp. Opp'n Mot. Stay, Ex. 3 to Teynier Decl., Cour d'Appel of Paris Judgment, June 4, 2013, R.G. No. 12/07231, ECF No. 86-1.

On December 17, 2013, the Cour d'Appel issued a judgment annulling the ICC's Jnah 3 Final Award, concluding that the Settlement Agreement between Fakhri and Shayah-owned Jnah did, in fact, give Fakhri the right to pursue Jnah 3, stating: "[the] Power of Attorney, contrary to

what was decided by the arbitral tribunal, empowered under the generality of its terms, its beneficiary to act on behalf of Jnah when the origin of the action, as in the present case, is in the contractual relationships that began with Marriott before May 4, 2009." Am. Compl. ¶ 112, Ex. 4, Cour d'Appel of Paris Decision, Dec. 17, 2013, R.G. No. 12/07231 at 6 (English translation), ECF No. 76-5.

Marriott appealed the decision of the Cour d'Appel to the highest French court, the Cour de Cassation, and, on March 18, 2015, the Cour de Cassation affirmed the Cour d'Appel's judgment of June 4, 2013, but quashed the judgment of December 17, 2013. Am. Compl. ¶ 115; *see* Cour de Cassation Decision, civ. 1, Mar. 18, 2015, at 3 (English translation), ECF No. 60-2. The Cour de Cassation held that whether Fakhri was entitled to bring the Jnah 3 arbitration was a question of admissibility (i.e. standing) rather than jurisdiction: "the arbitral tribunal, having interpreted the power of attorney . . . had ruled on a question relating to the admissibility of the request for arbitration . . . and not on the extent of its jurisdiction." Cour de Cassation Decision at 3, 11 (citing Civil Code, art. 1520). As the Amended Complaint in this Court explains, "the legal question presented was a question of admissibility, which was for the arbitrators to decide, as opposed to a question of jurisdiction, where the Cour d'Appel could correct the arbitrators' erroneous reading of the contract." Am. Compl. ¶ 115. By quashing the Cour d'Appel's December 17, 2013 judgment that annulled the Jnah 3 award, the Cour de Cassation reinstated the award. *See* Cour de Cassation Decision at 3. The case was thereafter remanded to the Cour d'Appel of Versailles for a new annulment proceeding. *Id.*

On June 30, 2016, the Cour d'Appel of Versailles ruled in favor of Marriott, denying Fakhri's request to annul the Jnah 3 award. *See* Def.'s Notice, Ex. A, Certified English Translation of Cour d'Appel of Versailles Decision, civ., June, 30, 2016, R.G. No. 15/03050,

ECF No. 152-1; Pl.'s Notice, Ex. A to Norberg Aff., Corrected Translation of Cour d'Appel of Versailles Decision, ECF No. 154-1. Specifically, the Versailles court rejected Fakhri's argument that the Jnah 3 award had been gained by means of fraud, noting that there was no evidence that Aouad and Abousleiman personally received money for their testimony; that Abousleiman's testimony was not "systematically" consistent with Marriott's position; that Aouad had sent a letter on April 13, 2011 to the secretary general of the arbitration court of the ICC that disavowed Fakhri's capacity to bring Jnah 3; and that, consequently, the testimony of Aouad and Abousleiman was not "a priori favorable to the thesis argued by the company Marriott."[8] Pl.'s Corrected Translation at 8-9, ECF No. 154-1. The Cour d'Appel of Versailles also concluded that even if Fakhri had had a copy of Jnah-Marriott Settlement Agreement at the time of the Jnah 3 hearing, this information would not have affected the outcome of the Jnah 3 award. *Id.* at 10.

The Cour d'Appel further determined that in the context of an appeal, unlike its competence vis-à-vis a jurisdictional question, the annulment court could not consider the question of admissibility (i.e. standing). *Id.* at 11-12 (citing Civil Code, art. 1520). Noting that the annulment court's analysis should restore the question presented in the arbitration to its true scope, the court reasoned that:

> [T]he arbitral tribunal did not at any point address the question of scope of its jurisdictional power . . . in which the judge [on appeal] could hear the case . . . but only involved the powers that Mr. Fakhri had to refer to the arbitral court a new arbitration request on behalf of the company Jnah, this falls under the category of a debate on admissibility, which the judge of the annulment cannot hear.

*Id.* at 11. As a result, "Jnah and Mr. Fakhri did not have the grounds to dispute in the context of an appeal for annulment the consideration made by the arbitral tribunal on the admissibility of

---

[8] The Versailles Court refers to the "Lebanese attorney for the new shareholders of the company Jnah" as Ms. Souleiman, rather than Ms. Abousleiman, the name used by the Jnah 3 tribunal and the parties in the present suit. *See* Pl.'s Corrected Translation at 8-9, ECF No. 154-1.

their claim." *Id.* at 12.  The court thus rejected Fakhri's appeal for annulment of the Jnah 3 final award, finding that no fraud had occurred and that it could not review the tribunal's determination on admissibility.  *Id.*  Although the decision stated that it was "binding on the parties with no right of appeal," *id.*, Fakhri has indicated that he is at this time still considering an appeal of the Versailles court's decision on the issue of fraud.  *See* Pl.'s Corresp. Versailles Cour d'Appel Decision at 2, ECF No. 156.

<u>Jnah 4</u>

On January 14, 2014, while the Jnah 3 appeal was pending before the Cour de Cassation, Fakhri initiated a "Renewed Request for Arbitration" with the ICC, seeking relief for Marriott's wrongful termination of the hotel Management Agreement in July 2007 ("Jnah 4").  Def.'s Reply, Ex. B, Jnah 4 RFA ¶¶ 77, 85, 107, ECF No. 129-3 (seeking "an amount of damages sufficient to compensate Jnah for lost profit from the wrongful and premature termination of the Management Agreement, and the market value lost from the forced sale of Jnah to avoid a foreclosure by the Arab Bank.").  The request stated that "the facts and claims asserted . . . are identical to the Request for Arbitration filed in June 2010"—i.e. Jnah 3.  *Id.* at 1.  Fakhri sought this arbitration both "in his capacity as the assignee and attorney-in-fact of Jnah."  *Id.* ¶ 14; *see also* June 20, 2016 Hr'g Tr. 74:6–75:4.  Jnah 4 was stayed pending the outcome of the "annulment proceedings in the Versailles Court of Appeal" to vacate Jnah 3.  *See* Def.'s Mot. Stay, Ex. 10, ICC Stay Order, June 16, 2015, ECF No. 84-12.

So much for the Jnah 3 battlefield and related proceedings. Simultaneously, the war was also proceeding on another front – in Lebanon.

<u>Proceedings in Lebanon</u>

In Beirut, Fakhri also pursued arbitration against Shayah-owned Jnah over the POA and AOR provisions under their Settlement Agreement. Am. Compl. ¶¶ 106-11. That arbitration was initiated on October 29, 2012 before Arbitrator Michel Soumrani. *Id.* ¶ 107. In an Award issued on September 17, 2013, in marked contrast to what the ICC tribunal had held, Arbitrator Soumrani decided that the POA and AOR, in fact, gave Fakhri the right to pursue Jnah 3 and that Shayah-owned Jnah had breached its obligations under its Settlement Agreement with Fakhri. The Arbitrator ordered Shayah-owned Jnah to pay Fakhri $11 million in damages. *Id.* ¶ 110; Am. Compl., Ex. 3, Soumrani Arbitration Award ¶ 57, ECF No. 76-4. Shayah-owned Jnah appealed the award to the Lebanese court system, where the matter is still pending. Am. Compl. ¶ 111; June 20, 2016 Hr'g Tr. 7:15-8:16, ECF No. 151.

In yet another twist, on November 15, 2014, a Lebanese court found Fakhri criminally liable for having accepted the Jnah 2 award on Jnah's behalf. *See* Countercl. ¶ 9, ECF No. 83; June 20, 2016 Hr'g Tr. 8:17-9:21, ECF No. 151. That court ordered Fakhri to serve three years in prison unless he paid Jnah $3 million out of the Jnah proceeds that he was deemed to have misled Marriott into paying to him, *see* Countercl. ¶ 9, a sentence that has not yet been executed and which is currently on appeal to the Lebanese Court of Cassation.[9] *See* June 20, 2016 Hr'g Tr. 8:17-9:21, ECF No. 151.

**B.**

Which brings us to the present litigation:

Fakhri initiated the present suit on March 18, 2014, following the decision of the Cour d'Appel of Paris but prior to the decision of the Cour de Cassation in Jnah 3. Marriott moved to dismiss the suit on May 12, 2014. At a motions hearing held on October 20, 2014, this Court

---

[9] According to Fakhri's counsel, in Lebanon, the criminal suit is imposed as a penalty for the non-payment of a civil obligation. *See* June 20, 2016 Hr'g Tr. 9:7-10, ECF No. 151.

issued an order that deferred ruling on Marriott's Motion to Dismiss in order for the parties to engage in limited discovery on the issue of whether "Lebanon recognizes the tort of interference with contractual relations and what damages, if any, are awardable in connection with such tort." Order, Oct. 20, 2014, ECF No. 34.

The parties conduct limited discovery on those issues; then, on March 20, 2015, Marriott filed a Motion for Summary Judgment, or in the alternative, a renewed Motion to Dismiss on the ground that no tort of interference with contractual relations is recognized under Lebanese law. ECF Nos. 56, 57. Fakhri responded, ECF No. 62, and, on May 1, 2015, moved to file an Amended Complaint. ECF No. 66.

At a motions hearing held on June 22, 2015, the Court denied Marriott's Motion for Summary Judgment and Motion to Dismiss, holding that a genuine dispute of material fact existed as to whether the tort of interference with contractual relations is cognizable under Lebanese law. ECF Nos. 74, 75; *see* June 22, 2015 Hr'g Tr. 90:20–91:8. The Court granted Fakhri leave to file an Amended Complaint, which he did the following day.[10]

Marriott responded with an Answer that included counterclaims for fraud, negligent misrepresentation and unjust enrichment against Fakhri for the purportedly false representation that he was entitled to accept the $10,876,922.80 payment for Jnah 2. Def./Cntr-Pl.'s Countercl. ¶¶ 11-25, ECF No. 83. Fakhri filed a Motion for a More Definite Statement, ECF No. 87, which the Court granted-in-part, directing Marriott to indicate which jurisdiction's law its counterclaims were based on. *See* Memorandum Order, ECF No. 119. Marriott indicated that

---

[10] As relates to the Court's ruling on June 22, 2015, the Amended Complaint states: "To the extent the Court determines that Lebanese law does not apply, or that Lebanese law is unclear as to whether a cause of action for tortious interference with contract exists, then the law of the forum, Maryland law, must apply." Am. Compl. ¶ 122, ECF No. 76.

New York law would apply, because it purportedly sustained injury in that jurisdiction when it wired Fakhri the Jnah 2 payment from its account in New Yok.  ECF No. 133.

Marriott also filed a Motion to Stay the present suit pending resolution of the French proceedings on the ground that the French proceedings would end the present action.  ECF No. 84.  In his Response in Opposition, Fakhri argued that a stay was inappropriate because, among other reasons, he had independent ownership of the claim against Marriott through the AOR and had suffered distinct damages.  *See* Pl.'s Resp. Opp'n Mot. Stay, ECF No. 86.

Then, on March 4, 2016, while the Court was considering its Motion to Stay, Marriott moved to dismiss Fakhri's claims altogether, asserting that for two reasons the Court lacked subject matter jurisdiction: (1) pursuant to the arbitration clause in the Jnah-Marriott Management Agreement, the claims fell under the exclusive jurisdiction of the ICC, and (2) the present suit represented a collateral attack on the Jnah 3 arbitral process before the ICC and the French courts which, under the New York Convention, deprived this Court of subject matter jurisdiction.  Marriott submitted that, in the dress of Fakhri's tortious interference claim, he was in fact seeking to litigate the very same underlying claims and the very same damages he was denied in Jnah 3, which would necessarily require this Court to vacate, modify, or set aside the Jnah 3 award, in violation of the New York Convention.

Following the Court's partial grant of Fakhri's Motion for a More Definite Statement as to Marriott's Counterclaims, Fakhri filed his own Motion to Dismiss Counterclaims for Failure to State a Claim.  Pl./Cntr-Def.'s Mot. Dismiss, ECF No. 137.  In his Motion to Dismiss, Fakhri has argued, as an initial matter, that the counterclaims are time-barred by reason of Maryland's three-year statute of limitations, and further, that because the counterclaims are permissive rather than compulsory, no tolling occurred from the date his complaint was filed.  In addition, Fakhri

puts forth other arguments as to why Marriott has failed to state a claim on the merits, including that it suffered no cognizable injury when it paid Fakhri the Jnah 2 award, because the payment of the full award to Fakhri, as Shayah-owned Jnah's apparent agent, fully discharged Marriott's liability to Shayah-owned Jnah for Jnah 2. Any further payment by Marriott to Shayah-owned Jnah was said to be both unnecessary and voluntary.

## II.

### Legal Standard

The Court considers Marriott's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

### A.

Federal courts are courts of limited subject matter jurisdiction: they "possess only the jurisdiction authorized them by the United States Constitution and by federal statute." *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Bowles v. Russell*, 551 U.S. 205, 127 S. Ct. 2360, 168 L.Ed.2d 96 (2007)). Section 1331 of Title 28 provides for federal question jurisdiction, or "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Parties can neither confer subject matter jurisdiction nor waive a jurisdictional defect. *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004). As a result, a party may raise questions of subject matter jurisdiction at any time, while the district court must raise such questions *sua sponte*. *Id.* (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S. Ct. 1326, 89 L.Ed.2d 501 (1986)) When a district court determines that it lacks subject matter jurisdiction over an action, it must dismiss the action. *Vuyyuru*, 555 F.3d at 347 (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07, 126 S. Ct. 1235, 163 L.Ed.2d 1097 (2006)).

A party may move for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) where the court lacks subject matter jurisdiction over the claims alleged in the complaint. Fed. R. Civ. P. 12(b)(1). As the party asserting jurisdiction, the plaintiff bears the burden of proving that the district court has subject matter jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). In considering whether to dismiss for lack of jurisdiction, the court may consider "evidence outside of the pleadings without converting the proceeding into one for summary judgment." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quoting *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768); *see also Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) ("[T]he court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning [subject matter] jurisdiction.").

## B.

The starting point for the enforcement of arbitral awards, whether foreign or domestic, is the "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S. Ct. 3346, 87 L.Ed.2d 444 (1985); *see also ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 390 (4th Cir. 2012); *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1098 (9th Cir. 2011) (indicating that there is a strong public policy favoring confirmation of foreign arbitration awards); *Jain v. de Méré*, 51 F.3d 686, 688-89 (7th Cir. 1995). In the context of foreign arbitral awards, this policy includes "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes . . . ." *Mitsubishi Motors*, 473 U.S. at 629, 105 S. Ct. 3346.

A foreign arbitral award, or any award sought to be enforced in a signatory country other than the one in which the award has been made, falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention"). June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 38.  The Convention applies to "arbitration agreements and awards arising out of commercial relationships, unless they are entirely between United States citizens and have no 'reasonable relation with one or more foreign states.'"  *ESAB Grp.*, 685 F.3d at 382 (quoting 9 U.S.C. § 202).  In the United States, the New York Convention has been implemented by Chapter 2 of the Federal Arbitration Act ("Convention Act").  9 U.S.C. §§ 201–08.  The New York Convention and its implementing legislation "articulate a uniform policy in favor of enforcing agreements to arbitrate internationally," *ESAB Grp.*, 685 F.3d at 390, and "demand that courts 'subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration.'"  *Id.* (quoting *Mitsubishi Motors*, 473 U.S. at 639, 105 S. Ct. 3346).

Pursuant to the Convention and the Convention Act, United States district courts have original jurisdiction over an "action or proceeding falling under the Convention."  9 U.S.C. § 203; *see Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 212 (4th Cir. 2002) (citing 9 U.S.C. §§ 203, 207).  Arbitration actions under the Convention are divided into two stages: (1) the arbitration-enforcement stage, where the district court considers whether claims should be referred to arbitration, and (2) the award-enforcement stage, where the district court is presented with a request to recognize and enforce a foreign award.  *See Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 372 (4th Cir. 2012) (citing *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 115 S. Ct. 2322, 132 L.Ed.2d 462 (1995); and citing *Mitsubishi Motors*, 473 U.S. at 639, 105 S. Ct. 3346).

After an arbitral tribunal has issued an award, "[t]he Convention mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997). Only the courts with primary jurisdiction over the foreign arbitral award—usually the country of the arbitral situs—may vacate, set aside, or modify that award on appeal. *See id.* at 21-23 (citing Convention art. V(1)(e)); *see also TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287 (5th Cir. 2004) ("*Karaha Bodas II*"). United States federal courts have secondary jurisdiction over a foreign award, and, as a result, lack subject matter jurisdiction to vacate, set aside, or modify foreign awards. *See Karaha Bodas II*, 364 F.3d at 287-88; *cf. Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Indus. Y Comercial*, 745 F. Supp. 172, 177 (S.D.N.Y. 1990) ("[A]ny suggestion that a Court has jurisdiction to set aside a foreign award based upon the use of its domestic, substantive law in the foreign arbitration defies the logic both of the Convention debates and of the final text, and ignores the nature of the international arbitral system."). Accordingly, a court of secondary jurisdiction may only decide whether to enforce or recognize a foreign arbitral award.[11] *See Karaha Bodas II*, 364 F.3d at 287-88; *see also M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 847-48 (6th Cir.

---

[11] A party may seek the recognition or enforcement of an award in U.S. federal court while the courts of primary jurisdiction consider a pending action to vacate, modify, or set aside the award. Pursuant to the Convention, "a court maintains the discretion to enforce an arbitral award even when nullification proceedings are occurring in the country where the award was rendered." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 367 (5th Cir. 2003) ("*Karaha Bodas I*"); *see also Ingaseosas Int'l Co. v. Aconcagua Investing Ltd.*, 479 F. App'x 955, 960 (11th Cir. 2012) ("Article VI of the Convention expressly contemplates a situation where a court of secondary jurisdiction has a pending motion to enforce an arbitration award, and where an application to set aside the award is made to a primary-jurisdiction court."); *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 316-17 (2d Cir. 1998) (considering whether to stay enforcement proceedings pending litigation to set aside the award in the originating country).

1996).

In the context of a proceeding to recognize or enforce the foreign award, "a secondary jurisdiction court must enforce an arbitration award unless it finds one of the grounds for refusal or deferral of recognition or enforcement specified in the Convention." *Karaha Bodas II*, 364 F.3d at 288 (citing 9 U.S.C. § 207); *see also Europcar Italia,* 156 F.3d 310, 316 (2d Cir. 1998) ("[A]n arbitration award cannot be avoided solely on the ground that the arbitrator may have made an error of law or fact."). Article V of the Convention sets forth the limited, exclusive grounds on which a secondary jurisdiction may decline to enforce or recognize the foreign award.[12] *See Gulf Petro Trading Co., Inc. v. Nigerian Nat. Petroleum Corp.*, 512 F.3d 742, 747 (5th Cir. 2008) (citing *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 364 (5th Cir. 2003) ("*Karaha Bodas I*"). As the Fourth Circuit has

---

[12] A district may only vacate a foreign arbitral award pursuant to one of the narrow grounds set forth in Article V of the Convention. *See* 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention"). Article V of the Convention states, that "[r]ecognition and enforcement may be refused" only in the following circumstances:

> (1)(a) The parties . . . [were] under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it; . . . or
> (1)(b) The party against whom the award is invoked was not given proper notice of . . . the arbitration proceedings or was otherwise unable to present his case; or
> (1)(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . . ; or
> (1)(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place . . . ; or
> (1)(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made. . .
> (2)(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or
> (2)(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

21 U.S.T. at 2520; 9 U.S.C. § 207; *see also AO Techsnabexport v. Globe Nuclear Servs. & Supply GNSS, Ltd.*, 404 F. App'x 793, 797 (4th Cir. 2010).

indicated, "a court considering a complaint seeking confirmation of an arbitration award may determine only whether the arbitrators acted within the scope of their authority, and may not consider whether the arbitrators acted correctly or reasonably." *AO Techsnabexport v. Globe Nuclear Servs. & Supply GNSS, Ltd.*, 404 F. App'x 793, 797 (4th Cir. 2010) (citing *Three S Delaware, Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th Cir. 2007)).

Correspondingly, a court in a secondary jurisdiction also lacks subject matter jurisdiction over a suit that seeks vacate, set aside, or modify a foreign award through claims that are merely dressed up to appear independent of the award—i.e. by means of collateral attack. *See Gulf Petro*, 512 F.3d at 747; *see also Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 588-94 (7th Cir. 2001) (affirming the district court's dismissal for lack of subject matter jurisdiction of state-law fraud, tort, and contract claims as barred by the New York Convention given that the issues had already been the subject a valid foreign arbitration decision). The same is true in the context of domestic arbitration; courts have dismissed claims for lack of jurisdiction as a collateral attack on the domestic award. *See Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 205 F.3d 906 (6th Cir. 2000) (affirming the dismissal of several contract and tort claims alleging wrongdoing in the course of a domestic arbitration proceeding); *Corey v. New York Stock Exchange*, 691 F.2d 1205 (6th Cir. 1982) (dismissing claims as a collateral attack on domestic arbitration); *cf. Foster v. Turley*, 808 F.2d 38, 41-42 (10th Cir. 1986) ("[When] a suit is in substance no more than a collateral attack on the award itself, it is governed by the provisions of the [Arbitration] Act.").

*Gulf Petro Trading Company v. Nigerian National Petroleum Corporation*, a case out of the Fifth Circuit, is particularly pertinent to the present suit. 512 F.3d 742 (5th Cir. 2008). There the appellate court affirmed the district court's determination that Gulf Petro's suit against the

Nigerian National Petroleum Corporation ("NNPC") constituted a collateral attack on a foreign arbitral award. The dispute that had been submitted to arbitration first arose in relation to a joint venture between NNPC and Gulf Petro's subsidiary, Petrec International, Inc. *Id.* at 744. A Partial Award in arbitration initially found that Petrec had standing to pursue claims and that NNPC had failed to contribute required capital. However, the arbitral panel's Final Award held that Petrec lacked capacity to maintain its claims against NNPC, because it was not a Texas corporation, having been incorporated in Texas only after execution of the joint venture agreement as well as the request for arbitration. *Id.* Swiss courts, which had primary jurisdiction over the case, upheld the panel's decision in set-aside proceedings. *Id.*

Gulf Petro and Petrec then brought suit in the U.S District Court for the Eastern District of Texas against NNPC and three members of the Swiss panel, asserting claims under RICO, the Texas Deceptive Trade Practices Act, common law fraud, common law tort of civil conspiracy, and seeking the vacation of the Final Award.[13] The Fifth Circuit affirmed the district court's dismissal of all claims based on lack of subject matter jurisdiction, holding that "a United States court sitting in secondary jurisdiction lacks subject matter jurisdiction over claims seeking to vacate, set aside, or modify a foreign arbitral award." *Id.* at 747. Although Gulf Petro argued that the RICO and state law claims were distinct violations that required independent relief from vacating the award, the Fifth Circuit rejected this argument, concluding that Gulf Petro's complaint "amount[ed] to no more than a collateral attack on the Final Award itself." *Id.* at 750.

In order to determine whether the claims constituted a collateral attack on the award, the Fifth Circuit opined that the district court should consider whether the claims ultimately

---

[13] In an earlier suit, Petrec sought to have the U.S. District Court for the Northern District of Texas enforce the Partial Award, which that court dismissed for lack of subject matter jurisdiction as a collateral attack on the Final Award. *See Gulf Petro Trading Co. v. Nigerian Nat'l Petrol. Corp.*, 288 F. Supp. 2d 783 (N.D. Tex. 2003).

concerned only the allegedly improper conduct and the "effect that it had on the Final Award," or whether the "harm was [] caused by the alleged acts of wrongdoing in and of themselves." *Id.* at 750. Thus, "where a party files a complaint . . . seeking damages for an alleged wrongdoing that compromised an arbitration award and caused the party injury, it 'is no more, in substance, than an impermissible collateral attack on the award itself.'" *Id.* at 751 (quoting *Decker*, 205 F.3d at 910 (quoting *Corey*, 691 F.2d at 1211-12)). The Fifth Circuit concluded that Gulf Petro was seeking the "award it believes it should have received, as well as costs, expenses, and consequential damages stemming from the unfavorable award it did receive—[which] shows that its true objective in this suit is to rectify the harm it suffered in receiving the unfavorable Final Award." *Gulf Petro*, 512 F.3d at 750; *see also Slaney*, 244 F.3d at 590 (affirming the district court's finding that Slaney's suit "seeks to address issues decided by the Tribunal" and "would undermine or nullify the Tribunal's decision.").

### III.

### Analysis

Relying primarily on *Gulf Petro*, Marriott characterizes the present suit as a "classic collateral attack" on the Jnah 3 final award, which the Court lacks subject matter jurisdiction to hear. Def.'s Mot. Dismiss at 18, ECF No. 104-1.

Fakhri counters that the present suit does not fall within what he characterizes as the narrow holding of *Gulf Petro*, i.e. that a claim is a collateral attack only if it "alleges wrongdoing *in the conduct of an arbitration* that affects the award and seeks to rectify the harm done to the award." Pl.'s Resp. Opp'n Mot. Dismiss at 2, ECF No. 111 (emphasis in original). He asserts that the tort of wrongful interference that he has alleged against Marriott occurred outside the conduct of the arbitration for several reasons: (1) the Jnah 3 arbitration was brought pursuant to

the POA and not the AOR arising out of his agreement with Jnah, and therefore the Jnah 3 award did not include any decision as to the scope of the AOR, (2) he was harmed by Marriott's inducement of Shayah-owned Jnah to break its contract with Fakhri, which occurred independently of the Jnah 3 award; and (3) the damages he seeks are "not co-extensive" with those sought in Jnah 3, including purported damages to Fakhri's reputation, emotional distress, and attorneys' fees. *Id.* at 1-2, 15-19, 20-22.

The Court considers Fakhri's contentions:

First, Fakhri argues that he seeks to recover damages that "include interference with Fakhri's individual rights under the Assignment of Rights ('AOR'), whereas the Jnah 3 final award currently undergoing annulment proceedings is explicitly limited to the procedural issue of Fakhri's standing under his Power of Attorney ('POA')." Pl.'s Resp. Opp'n Mot. Dismiss at 2, ECF No. 111. In support of this argument, Fakhri emphasizes that the Cour d'Appel of Paris (the first French court to review the Jnah 3 arbitral award) ruled that he could proceed with the annulment proceeding under the POA but not the AOR, since he had only brought Jnah 3 under the POA—a decision that was affirmed by the Cour de Cassation. *See id.* at 13-14, 17. Pl.'s Corresp. Cour d'Appel of Versailles Decision at 4, ECF No. 156.

Marriott takes strong exception to this. The ICC panel, says Marriott, did in fact consider the AOR in its Jnah 3 award, and, even assuming *arguendo* it did not, Fakhri is nevertheless seeking the same damages in this suit that he sought in Jnah 3. *See* Def.'s Reply at 11, ECF No. 129. Further, says Marriott, to award Fakhri damages under the AOR, this Court would have to determine whether Marriott wrongfully terminated its Management Agreement with Jnah, an issue which this Court lacks subject matter jurisdiction to decide, since any and all claims arising from the Management Agreement fall within the exclusive jurisdiction of the ICC. *See* Def

Reply at 4, ECF No. 129.

The parties have devoted dozens of pages to the question of whether the Jnah 3 award considered not only the POA but the AOR as well.  What is clear, however, is that while Fakhri may have relied on the POA alone to bring the Jnah 3 proceeding, the arbitral tribunal carefully considered the language of the AOR for purposes of interpreting the scope of the POA provision.  *See* June 22, 2015 Hr'g Tr. 92:6-9, ECF No. 81 (The Court observed that "the Power of Attorney was the principal document that has been before the . . . arbitration panel and courts in France, not the assignment of rights.").  In the words of the ICC panel in the Final Award: "it became clear during the hearing that Mr. Fakhri relies solely on the Power of Attorney as authority for him to bring these proceedings in the name of Jnah but invokes the wording of the Assignment as a tool to aid the interpretation of the Power of Attorney."  *See* Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 101.

The essential point is this: whatever the scope of the POA may have been, there was never any disagreement in the Jnah 3 proceedings that the scope of the AOR would be identical.  Accordingly, the panel considered evidence from both parties' experts in Lebanese law regarding the scope of the AOR, noting that Jnah's (Fakhri's) expert "laid much emphasis on the Assignment as a means of interpreting the scope of the Power of Attorney." Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award ¶ 145, ECF No. 104-3.  Both experts believed that the POA and AOR had to be read together because the two provisions were identical in scope; they disagreed only over whether the POA and AOR extended to Jnah 3.  *See id.* ¶¶ 145-49.  Marriott's expert in Jnah 3, Dr. Moghaizel, relied on language in the AOR that limited indemnity to "the aforementioned arbitration case," which he believed made clear "that the parties intended to assign to Mr. Fakhri both the potential proceeds and the potential liabilities arising out of Jnah II." *Id.* ¶ 145. The

majority of the arbitration panel preferred "Dr. Moghaizel's interpretation of the word of the Assignment which it considers is consistent with its finding in relation to the ambit of the Power of Attorney." *Id.* ¶ 146.[14]

In view of this, the Court is unable to agree with Fakhri that "[t]he Court is entitled to value the rights assigned to Fakhri, and [that] doing so does not constitute a collateral attack on the Jnah 3 award, which did not purport to value the Assignment." *See* Pl.'s Resp. Opp'n at 18, ECF No. 111. The AOR, which Fakhri bases his claim on in this Court, has been consistently understood and argued by both parties to be identical in scope to the POA that Fakhri relied on in Jnah 3. What Fakhri characterizes as the "value of the Assignment" is really nothing more than the value of any and all claims arising from Marriott's termination of the Management Agreement—i.e. the damages sought in Jnah 3. He does not, and cannot, claim otherwise. Assessment of the value of the rights assigned to Fakhri would unquestionably require the Court to resolve the Jnah 3 claims on the merits—which is to say the damages arising out of Marriott's termination of the Management Agreement.

Second, can it be said, as Fakhri argues, that the harm Fakhri says he has suffered occurred outside of the Jnah 3 arbitration through the so-called fraudulent agreement Marriott made with Shayah-owned Jnah? Or was it, more realistically viewed, the effect that the agreement had on the Jnah 3 award?

The Fifth Circuit in *Gulf Petro* held that the district court should consider the effect that the allegedly wrongful acts had on the final arbitral award:

> Gulf Petro contends that it has pled independent violations of federal and state law, but the ultimate significance of the conduct it complains of can only be found in the effect that it had on the Final Award. . . . Gulf Petro's harm was not caused by the alleged acts

---

[14] Marriott further cites Fakhri's Lebanese legal expert, who opined that "[t]he POA was designed as an instrument to enforce the assignment of rights." Def.'s Mot. Dismiss at 18-19 (citing Supplemental Rule 44.1 Report of Mouhib Maamari, Sept. 8, 2014 ¶ 33, ECF No. 32).

of wrongdoing in and of themselves. The harm in this case did not result when the arbitrators failed to disclose business dealings, engaged in ex parte communications with NNPC, or were bribed. Rather, it resulted from the impact that these acts had on the Final Award.

*Id.* at 750; *see also Corey*, 691 F.2d at 1213 ("[The plaintiff] was not harmed by the selection of the arbitrators and the adjournments of the hearings in and of themselves . . . Rather, he was harmed by the impact these acts had on the award."); *Decker*, 205 F.3d at 910 (the alleged harm suffered by the plaintiff "did not result when the Merrill Lynch subsidiary hired the chairperson . . . but instead resulted from the impact of this action on the arbitration award.").

In the present suit, the harm Fakhri complains of can only be found in the effect it had on the Jnah 3 final award. The heart of his suit is that he "was wrongfully deprived of his contractual right to pursue the Jnah 3 arbitration against Marriott." Am. Compl. ¶ 124. He pleads that, under the terms of his Settlement Agreement with Shayah-owned Jnah, he was granted the POA and the AOR to pursue the claims against Marriott brought in the Jnah 3 arbitration. He thereafter initiated Jnah 3 arbitration. But because of the Jnah-Marriott agreement, Fakhri concludes, he "was wrongfully deprived of his contractual right to pursue the Jnah 3 arbitration against Marriott." Am. Compl. ¶ 124. He goes on to suggest that Marriott's payoff to Shayah-owned Jnah was made in exchange for Jnah giving evidence against Fakhri in the Jnah 3 proceedings. As Fakhri puts it in his Response in Opposition to Marriott's Motion to Dismiss, Marriott "paid Shayah-owned Jnah $800,000 to have (i) the CEO of Shayah-owned Jnah write a letter to the Jnah 3 tribunal denying Fakhri's rights under the POA to maintain that action, and (ii) the General Counsel of Shayah-owned Jnah testify that Fakhri's POA did not authorize him to commence the Jnah 3 arbitration." Pl.'s Resp. Opp'n Mot. Dismiss at 15-16, ECF No. 111.

But no agreement between Marriott and Shayah-owned Jnah could "wrongfully deprive"

Fakhri of the right to pursue Jnah 3: the decision as to his contractual right to pursue Jnah 3, whatever it might be, remained entirely in the hands of the ICC tribunal. If the tribunal had agreed with Fakhri, Marriott's purported attempt to wrongfully deprive him of the right to pursue Jnah 3 would have failed, and he would have received the damages he sought for his claims arising out of the termination of the Management Agreement. Marriott's purported fraud only harmed Fakhri in relation to the extent that it had an effect on the Jnah 3 award. As established by the Fifth Circuit in *Gulf Petro*, allegations of fraud within the arbitration proceeding do not give a court of secondary jurisdiction subject matter jurisdiction to modify, vacate, or set aside the Jnah 3 award and provide Fakhri the damages he seeks. *See Gulf Petro*, 512 F.3d at 749-51; *see also Slaney*, 244 F.3d at 590. The Convention grants the courts of primary jurisdiction the exclusive power to entertain such requests. *See Karaha Bodas II*, 364 F.3d at 287; *Int'l Standard Elec.*, 745 F. Supp. at 177; *cf. Decker*, 205 F.3d at 910 ("Once an arbitration is conducted under a valid arbitration contract, the FAA 'provides the exclusive remedy for challenging acts that taint an arbitration award.'" (quoting *Corey*, 691 F.2d at 1211)). The Cour d'Appel of Versailles, as the court of primary jurisdiction, has now considered Fakhri's petition to vacate the Jnah 3 award—including Fakhri's allegations of fraud by Marriott with Jnah's assistance—and has in effect found in Marriott's favor.

Finally, Fakhri submits that the damages he seeks in this Court are not co-extensive with those sought in Jnah 3.

The Fifth Circuit in *Gulf Petro* is again instructive: the nature of the damages sought goes to the essence of whether a suit is a collateral attack on an award, so that the district court must look to whether the plaintiff seeks to relitigate the damages he sought but was denied by the final arbitral award. The Fifth Circuit determined that, notwithstanding Gulf Petro's argument that it

sought to litigate federal and state claims that were independent of the award: "they do seek to relitigate certain issues, since Gulf Petro asks for as damages the award it believes it should have received in the arbitration, which would require an inquiry into questions of liability that were already presented to the arbitration panel." *Id.* at 750; *see Slaney*, 244 F.3d at 590 ("[If] we are required to acknowledge the foreign arbitration decision . . . we cannot exercise subject-matter jurisdiction over her present claims, as that would require prohibited relitigation of previously decided issues.").

In similar fashion, Fakhri is attempting to use the present suit as a means of relitigating the very same damages that were presented to the ICC panel in Jnah 3, i.e. where he requested "an amount of damages sufficient to compensate Jnah for lost profit from the wrongful and premature termination of the Management Agreement, and the market value lost from the forced sale of Jnah to avoid a foreclosure by the Arab Bank." Def.'s Mot. Dismiss, Ex. 5, Jnah 3 RFA ¶ 101A.[15] It is inconsequential that the Jnah 3 award may not have reached the merits of the damages issue. In the Texas district court, the plaintiff in *Gulf Petro* had also challenged the *jurisdictional* award of a foreign arbitral tribunal that determined the plaintiff lacked the capacity to bring the arbitration proceeding. Because the plaintiff was trying to recover in a U.S. court the "award it believes it should have received," the Fifth Circuit concluded that its "true objective in this suit [was] to rectify the harm it suffered in receiving the unfavorable Final Award." *Gulf Petro*, 512 F.3d at 750.

Fakhri's "true objective in this suit," in the Court's view, is to rectify the outcome of Jnah 3. Nothing in the Amended Complaint indicates that this suit is anything other than an attempt to

---

[15] Identical language appears in Fakhri's Renewed Request for Arbitration in Jnah 4, in which he asks, "[o]n the First and Second Claims, for an amount of damages sufficient to compensate Jnah for lost profit from the wrongful and premature termination of the Management Agreement, and the market value lost from the forced sale of Jnah to avoid a foreclosure by the Arab Bank." Def.'s Reply, Ex B. Jnah 4 RFA ¶ 107.

relitigate the damages sought in Jnah 3 by another means.  In the single count of his Amended

Complaint, Fakhri characterizes his damages as follows:

> The purported "settlement" between Marriott and Shayah-owned Jnah caused material
> damage to Mr. Fakhri. By settling the wrongful termination claim raised in Jnah 3 with
> Shayah-owned Jnah, Marriott saved tens of millions of dollars compared to the settlement
> it was discussing with Fakhri. Further, Marriott was able to obtain dismissal of the Jnah 3
> arbitration for lack of jurisdiction. <u>Mr. Fakhri was wrongfully deprived of his contractual
> right to pursue the Jnah 3 arbitration against Marriott</u>.
>
> Further, <u>Mr. Fakhri has incurred significant costs and legal fees in the Jnah 3 arbitration
> [and French proceedings]</u>. . . . In addition, <u>Mr. Fakhri has suffered substantial damages
> including emotional and reputational harm</u>[.]

Am. Compl. ¶¶ 124-26 (emphasis added).  Fakhri's alleged damages, even if asserted pursuant to

the AOR, are essentially co-extensive with those resulting from the "dismissal of the Jnah 3

arbitration,"—i.e. they are related to the termination of the Management Agreement.

As Marriott argues, discovery in the present case underscores the fact that Fakhri is

pursuing damages arising from the termination of the Management Agreement.  *See* Def.'s Mot.

Dismiss, Ex. 11, Pl.'s Mem. Supp. Mot. Compel RFPs at 11, ECF No. 104-13 ("[Fakhri] should

be entitled to damages that would have been recoverable for Marriott's breach of the

Management Agreement. . . .").  Indeed, one of Fakhri's experts in this case, Bernard

Mouchbahani, developed a 61-page report that calculates Fakhri's damages at U.S. $49,191,032

including: (1) "Loss of Profit for Premature Termination of Management Contract," (2)

"Diminished Market Value of the Hotel Due to Forced Fire Sale," and (3) "Additional Debt and

Equity Injections Due to Operating Losses" that were required due to Marriott's earlier breach

and eventual termination of the Management agreement.  *See* Def.'s Mot. Dismiss at 7-8; Ex. 7,

Mouchbahani Report at 57-59; *see id.* §§ VII, VIII, IX. These damages account for U.S.

$43,106,236, while the remaining $6,084,796, for good measure, are "Direct Consequential

Material Damages," i.e. legal fees from Jnah III, Jnah IV, the Soumrani arbitration and other Lebanese litigation, and the present suit. *See id.* at 57-59.

Despite this, Fakhri insists that the damages he seeks in his claim of tortious interference with contract relations are "not co-extensive" with those sought in Jnah 3, because they "include tort remedies such as damage to reputation, emotional distress, attorneys' fees and, under Lebanese law, Marriott's liability 'in solidum' (joint and several) for the breach of contract damages awarded in the Soumrani arbitration."[16]  Pl.'s Resp. Opp'n Mot. Dismiss at 2, 20-22, ECF No. 111; *see also* Pl.'s Corresp. Versailles Cour d'Appel Decision at 4-5, ECF No. 156. However, in *Gulf Petro*, the plaintiff sought damages similar to those Fakhri seeks in this case, including: "(1) costs and expenses of the arbitration and subsequent legal challenges; (2) lost expenses and profits that would have been awarded had the panel rendered a fair award; (3) reputational injury suffered as a consequence of not prevailing in the arbitration; and (4) lost business opportunities suffered as a consequence of not prevailing in the arbitration."  *Gulf Petro*, 512 F.3d at 749.  Consistent with *Gulf Petro*, the Court finds that Fakhri's damages claim, however creatively crafted, ultimately are also "for an alleged wrongdoing that compromised an arbitration award" and thus "no more than an impermissible collateral attack on the award itself." *Id.* at 751 (citations and internal quotation marks omitted).

Fakhri makes two other arguments in an attempt to distinguish *Gulf Petro*, both related to the stage of proceedings in the court of primary jurisdiction.

---

[16] "In solidum" or "in solido," according to Black's Law Dictionary (10th ed. 2014), refers to the creation of joint and several liability.  The request for "in solidum" damages based on the Soumrani Award against Shayah-owned Jnah first appeared in Plaintiffs' Response in Opposition to this Motion.  It is not in the Amended Complaint.  Fakhri does not address how such damages would be enforced against Marriott in a U.S. court, given that Marriott was not party to the arbitration.  Fakhri came up with a second "in solidum" claim at the hearing on this Motion, also not in the Amended Complaint, which he argues he is owed for Shayah-owned Jnah's failure to pay him an amount in a reserve escrow account under the AOR related to the Jnah 2 award.  *See* June 20, 2016, Hr'g Tr. 72:11–74:1, ECF No. 151; Pl.'s Corresp. Versailles Cour d'Appel Decision at 5, ECF No. 156.

First, he submits that he filed the present suit during a window of time when the Court d'Appel of Paris had annulled Jnah 3.  *See* Pl.'s Corresp. Versailles Decision at 3-4, ECF No. 156.  Since no Jnah 3 award existed on the date the present suit was filed, he says, the suit cannot be a collateral attack on an award that did not exist.  *Id.*; June 20, 2016 Hr'g Tr. 43:11-18, ECF No. 151. The Court rejects this logic and the implication that federal jurisdiction turns on and off like a light switch while an intimately related annulment proceeding is progressing through the foreign court with primary jurisdiction.  The Cour d'Appel of Versailles has in effect issued a final judgment on the question of whether Fakhri had standing to bring the Jnah 3 arbitration; more specifically, it has refused to annul the Jnah 3 award, concluding that it could not review the tribunal's determination that Fakhri lacked standing to bring the arbitration.  Although Fakhri may yet decide to appeal another issue—namely, the Cour d'Appel's rejection of his allegation of fraud[17]—the Court fails to see how that would in any way affect its jurisdiction over this suit.

Second, Fakhri argues that *Gulf Petro* applies only to "final, merits-based awards" that the courts of primary jurisdiction have finished reviewing.[18]  *See* Pl.'s Corresp. Versailles Decision at 4, ECF No. 156.  Although in *Gulf Petro* the Swiss courts had upheld the final arbitral award by the time the U.S. suit was filed, the Fifth Circuit did not give any indication

---

[17] The decision of the Cour d'Appel of Versailles says as to the right to appeal its decision: "through a JOINT ruling and binding on the parties with <u>no right of appeal</u>, IT REJECTS the appeal for annulment filed by the company Jnah and Mr. Fakhri . . . ." Pl.'s Corrected Translation at 12, ECF No. 154-1 (emphasis added).  Fakhri's counsel has represented to this Court that he has the right to appeal the decision of the Cour d'Appel as to the issue of fraud.  Presumably, he takes the position that the above-quoted language as to "no right of appeal" applies only to the question of standing, given that Fakhri did not mention any intention to appeal the decision as to standing.  *See* Pl.'s Corresp. Versailles Decision at 2, ECF No. 156.  Marriott has not contested Fakhri's assertion that he may yet have the right to appeal decision as to fraud. *See* Def.'s Corresp. Comments on Versailles Decision, ECF No. 155.

[18] A "final award" in the arbitration context, in contrast to an interim or partial award, commonly refers to the award issued by an arbitral tribunal that disposes of all claims before it. As the Fourth Circuit has noted, "[a]n award is final in nature when the arbitrators intend to include in the award their complete determination of all claims submitted for arbitration." *AO Techsnabexport*, 404 F. App'x at 799 (citing cases).  The Jnah 3 award was issued as a "final award."  *See* Def.'s Mot. Dismiss, Ex. 1, Jnah 3 Award at 1, ECF No. 104-3.

that such a procedural posture factored into their decision. *See* 512 F.3d at 744-45, 750-52. In fact, in both *Corey* and *Decker*—cases on which the *Gulf Petro* court relied—the plaintiffs were deemed to have engaged in collateral attacks on domestic arbitral awards simply by foregoing the process provided for under FAA to vacate the award and proceeding directly to file impermissible separate suits attacking the awards. *See Decker*, 205 F.3d at 909-11; *Corey*, 691 F.2d at 1207-08, 1211-12.

The Court declines to accept Fakhri's characterization of its role as a secondary jurisdiction under the Convention. The logical conclusion of Fakhri's theory would be to allow a court of secondary jurisdiction to vacate, modify, or set-aside a final foreign arbitral award at any time prior to the exhaustion of the appellate process in the court of primary jurisdiction. The fact remains that a court of secondary jurisdiction is obliged to recognize or enforce a final foreign arbitral award, subject to limited exceptions, even when annulment proceedings remain pending in the court of primary jurisdiction. *See Karaha Bodas I*, 335 F.3d at 367 ("Under the Convention, a court maintains the discretion to enforce an arbitral award even when nullification proceedings are occurring in the country where the award was rendered."); *see also Ingaseosas Int'l Co. v. Aconcagua Investing Ltd.*, 479 F. App'x 955, 960 (11th Cir. 2012); *Europcar Italia*, 156 F.3d at 316-17 (considering the appropriateness of a stay of enforcement proceedings, rather than immediate enforcement of the award, pending litigation to set aside the award in the originating country). There is no reason to limit the holding of *Gulf Petro*—that courts of secondary jurisdiction may not entertain a collateral attack on the foreign award—only to cases where the annulment proceedings in the primary jurisdiction have come to an end.[19]

---

[19] Fakhri also asserts that the decision of the Cour d'Appel of Versailles has no preclusive effect given that there has yet to be a final decision on the merits. *See* Pl.'s Resp. Opp'n Mot. Dismiss at 18 n.7, ECF No. 111; Pl.'s Corresp. Versailles Decision at 2-3, ECF No. 156. However, in order to reach the question of the preclusive effect of a foreign judgment, the Court must first determine that it has jurisdiction over

Try as he may to mask the true purpose of the present suit, it is eminently clear that Fakhri is attempting to recover through a different avenue the damages he sought in Jnah 3— precisely the type of collateral attack on a foreign arbitral award that the Court lacks subject matter jurisdiction to entertain under the New York Convention.  While "a plaintiff need only be able to allege wrongdoing that has caused harm independent of its effect on the arbitration award to avoid the collateral attack label," *Gulf Petro*, 512 F.3d at 751, Fakhri has been unable to do so here.

The Court, it should be noted, takes no position on the question of whether Marriott may or may not have engaged in fraud in the context of the Jnah 3 proceedings, or on the question of what liability, if any, Marriott may yet have for the underlying claims related to its termination of its Management Agreement with Jnah.  Such determinations are simply not within this Court's province to decide.  Under the New York Convention, Fakhri certainly could—indeed he did— petition the French courts, as the courts of primary jurisdiction, to resolve these issues.  As things now stand, the Cour d'Appel of Versailles has rejected his argument of fraud, as well as his appeal of the annulment of the Jnah 3 award.

## IV.

Finally, the Court turns to Fakhri's Motion to Dismiss Marriott's Counterclaims for Failure to State a Claim.  Marriott has alleged claims of fraud, negligent misrepresentation, and unjust enrichment, all of which arise from Marriott's payment of the Jnah 2 award of approximately U.S. $10.9 million to Fakhri on Jnah's behalf.  Marriott asserts that Fakhri, through counsel, falsely represented that he "was authorized to receive payment of the entire

---

this suit.  Moreover, in *Gulf Petro*, the court rejected the argument that it should have considered the application of res judicata rather than undertake a jurisdictional inquiry: "the nature of Gulf Petro's claims, which relate first and foremost to the alleged tainting of the arbitration proceedings rather than the underlying contract dispute itself" demonstrates that there was "simply more at work here than res judicata." *Gulf Petro*, 512 F.3d at 752.

amount of the Jnah 2 award on behalf of Jnah."  Countercl. ¶ 7, ECF No. 83.

Fakhri has moved to dismiss the counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim but not under Rule 12(b)(1) for lack of subject matter jurisdiction—presumably because he was confident that the Court would affirm jurisdiction over his suit. But given that the Court has dismissed Fakhri's claim for lack of subject matter jurisdiction, there would have to be an independent basis for jurisdiction over Marriott's counterclaims, regardless of whether they are compulsory or permissive.  *See Columbia Gas Transmission Corp. v. Drain*, 191 F.3d 552, 559-60 (4th Cir. 1999) ("[I]t is the usual rule that a district court may exercise jurisdiction over a compulsory counterclaim after the original claim has been dismissed for lack of jurisdiction if the counterclaim has an independent basis for jurisdiction."); *see also Williams v. Long*, 558 F. Supp. 2d 601, 603 (D. Md. 2008) ("[A] permissive counterclaim that lacks its own independent jurisdictional basis is not within the jurisdiction of the court.").

Marriott has pleaded in its Counterclaim that the Court "has jurisdiction over this Counterclaim to the extent it has jurisdiction over the Amended Complaint."  Countercl. ¶ 3, ECF No. 83.

Furthermore, at the June 20, 2016 motions hearing, Marriott conceded that if Fakhri's suit is dismissed for lack of subject matter jurisdiction, the Court would lack jurisdiction over its counterclaims.  June 20, 2016 Hr'g Tr. 3:5–9, ECF No. 150.  Nothing more need be said.

## V.

For the foregoing reasons, Marriott's Motion to Dismiss for Lack of Subject Matter Jurisdiction is **GRANTED**, and Fakhri's claim for tortious interference with contractual relations is **DISMISSED**.

Likewise, Marriott's counterclaim, ECF No. 83, is **DISMISSED** for lack of subject matter jurisdiction.

A separate Order will **ISSUE**.


_____/s/_____

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**


**August 12, 2016**